Good morning, Your Honor. I'm Paul Heba from Syracuse, New York. I'm here to represent Barbara Ressler, who is the Assistant Attorney General in the field. As you can see from the briefing, there are two points that I've done going forward relating to the application of the application of whether there is substantial evidence to support the residual functional capacity that was assessed correctly in terms of function-by-function analysis. I'd like to note and to respond to a point that's well taken in the Commissioner's brief, is the expression maximum capacity. By adding that maximum residual functional capacity, I was sort of conflating the notion of RFC and the maximum ability or the ability to post that one can do. So I'd just like to clarify that point and to point that's well taken in the Commissioner's brief. Excuse me. Of course it's well taken. Yes, Your Honor. When in the Commissioner's brief on page 24, he notes or she notes that the credibility findings and the medical opinions are not challenged by you. Is that accurate? Did you hear what the Commissioner said? They're not challenged explicitly, but it is something that I do want to address more in the terms of how the residual function capacity analysis or function-by-function analysis was and was not done. Well, the reason I asked that question is that your reply brief, you didn't respond directly to those two comments on the Commissioner's brief. Right. It is with respect to the opinion and the assessment by Dr. Boyd-Doherty and the state agency medical examiners. The point that the concern that I had there was that the agency had not been coming up with the decision that it did. The agency had put the cart before the horse and it seems to be that the agency decided upon the For example, with respect to Dr. Boyd-Doherty's opinion and the state agency medical opinion, the decision says that they are excessive in weight to the extent that they are consistent with the RFC. Is that what you're asking? He was saying that he was consistent with the RFC. Well, consistent with his, I think, ALJ said he was consistent with the opinion that the ALJ was right. So is that the standard you should be using or should it be something more explicit? It should be more explicit, yes. And the reason that gets back to the argument that we made with respect to the function-by-function analysis, that is in the SFR, depending on the NJ's decision itself, points out that both of the RFCs being the result of the function-by-function analysis in more detail than just the initial RFP criteria that was examined in step two. So your position is you fairly raised these issues and when you didn't respond to the commissioners' assertions that you weighed both of those arguments about credibility and medical opinions, that indeed, by virtue of the nature of what you asserted, they were inherently involved in them? They were in the sense that, because the agency that started the RFC did not do the function-by-function analysis, indeed, JLISM says that it should, and found that those opinions were acceptable in given weight only to the extent that they were consistent with what you already had reached, had already arrived at, residual function capacity. And that's why in the briefing that we're seeing, that's put in the court before the courts, because if you look at Excerpt 29, in the ALJ's decision, it's page 5 and 11, right at mid-pages, before the ALJ announces the actual RFC, really points out and takes it straight from the SFR review 96-8B, that the ALJ will now go in more, is supposed to go into more detail about a function-by-function analysis, and the Part B analysis, Excerpt 2, was not a general analysis that is now called for. So what I'm saying is that the ALJ or the agency decision then found those opinions to be consistent with the RFC that had already been derived, and what I'm saying is that they should first go into the function-by-function analysis in order to arrive at the residual functional capacity. So did the ALJ, I don't know, do you take account of her mental illness and look into the creds and the link in the finding map? Let's see how it worked. Well, you can take it when we know, Your Honor. I can give you an example too. It's in the after the ALJ examined the vocational expert, and then turned it over to the representative, this is on Excerpt 84, the very Excerpt 84, yes. So on the page before, the convoy with the vocational expert begins on 83, and basically the ALJ then has the need to identify herself, she does so, and then asks if she needs to do anything more for it to do, and what she said is, it would just classify the cash follow-up work, do they classify the cash follow-up work in the ALJ? So that's one of the questions that he asked, and then the representative steps in, and he asks, well, what about 10% off time? What about 15% off time? But this is a reflection on it, so then do you, Your Honor, that if one instance in which the ALJ did not sufficiently examine the function-by-function assessment, this is an obvious one, do you think the ALJ could have pursued a better follow-up work aspect, as we've pointed out in the brief, by simply asking the vocational expert? Was there evidence at all times that your client could not stay on task for 15% of the day? There is, there is evidence, but I would say that it was just that this has not been an assessment, that we cannot be sure of that. We have the evidence of how her condition is now, it has changed over time, as the record reflects. Of course, in many instances, they have achieved some level of amelioration in their condition, but we don't know if that is sufficient now to enable you to engage in substantial gainful activity. And also, let me switch over to just a quick side point. Part of the difficulty that we have with this decision, the final agency decision, is the ALJ does not speak in terms of ability to do substantial gainful activity. The ALJ speaks of the ability to work or search the restaurant, the chef, or your mother, are alleging the inability to do all work, but that's not the standard. That's not what they're alleging. We know that it just goes under the standard of substantial gainful activity. Part of the justification of understanding the final agency decision here is that, from time to time, it speaks of the ability or inability to engage in all work, but that's not the standard. Did the ALJ have anything to consider in terms of that basis or basis factor? The ALJ took into account what case made, and simply indicated that that's the reason why the exertional level of light exertion was derived out of nothing under the circumstances. It's efficient under the circumstances. The major concern is the pre-approval of the ALJ to do the function-by-function analysis of and for the RFC, as the ALJ said that he would do. That's on answer 29, as I said, just before finding number four. It points out that the function-by-function analysis is supposed to be in greater detail than was done at established to. That's something that addresses the point that the Commissioner addressed in her supplemental authority, citing Hukai, neither Halti nor Hukai really as a direct application here. Finally, the ALJ's finding with respect to the greater detail of the function-by-function analysis, that X049 is a direct reflection of SSR 206-2B, and at page four of the YSL version of the article, I see that I have just a minute here. I wish you were back. It's me. Thank you for the introduction. Thank you for the introduction. Good morning. My name is Nathan Burkle. I represent the Insecurity and Authenticity Commission of Social Security. Well, some of the facts in this case are dramatic. The legal issues before the court are narrow and straightforward. Before I turn to the arguments and ways I'm going to start, I want to point out that the relevant period in this case is very narrow. I'm going to start doing a plethora of reasons on how I ended up August of 2010 in the ALJ-issued decision in August of 2012. I'm going to start with a two-step shift to demonstrate some of the human distress curves. I think there's a few things we could move along after the shift, like where this is tied. What it shows is that in May of 2011, when she was changed her medication, or the psychiatrist changed her medication, and after that she reported an improvement, and there was a consistent chart of improvement after that point. So, you know, we have doctors describing her symptoms as mild, and then later, more violent. They led the survey, for example, for the ALJ not to find her disabled during the relevant period. So some of the librarians believe that her brief on records from before the relevant period was on a specialist disability after August of 2010. I have the same question that I have for you. What do you make of your argument that the weight of the evidence and the credibility of the determinations have been waived? Well, I do believe, given what I'm doing, you know, in both the district court and before the court, in our response where it's been pointed out that plaintiffs did not directly challenge them, and there was no discredit on that statement at all in her brief. I mean, as for just function-by-function analysis, in your opinion, will it greater the living and medical advantage? No, it does not, and it does not, number one, in regards to the function-by-function analysis, as far as being very clear in multiple pieces, that a formal function-by-function analysis is what the RFC session is now required, and all that's required is an ALJ to support the RFC finding with the facts. In any event, in this case, the meta-court opinions are entirely consistent with the RFC. We have doctors working to perform the quantitative examination in terms of doing a lowly observed or a lowly applied incumbency limit and mild limitations, and then we have to see the doctors that assess the necessary C-functioning based on the medical regularities. In other words, he doesn't do a comparison of the training and the examining and the non-examining, he simply says, to the extent consistent with them, but we don't know what he's referred to, but it's just pretty vague. Well, when a medical opinion is consistent with the RFC, the RFC-relational requirement is lessened. When you have a medical opinion that is contrary to the RFC, then the ALJ's obligations to assess the reasons for differing or the reasons for exceeding the opinion is heightened. So we don't have that in this case, and I point out that both of the state agency doctors, in their case analysis, both of them said that the agreement would be able to perform simple, unskilled work, and with respect to the first state agency doctor, that's at page 145 of the administrative record, with respect to the second state agency doctor, that is at page 122 of the administrative record. So both were saying, explicitly, that a group of state agencies would be able to perform simple work. So with that in respect, she hears voices of community relations, and from the findings that I've described to you, isn't that an essential problem for this person's RFC work? Well, what's interesting is while she tests the report that she hears, if she does hear voices, number one, there is improvement, but these doctors are also assessing before the improvement, and while she does hear these voices, she's actually able to relate to the providers that she meets very, very well. When they have mental health exams, and her mental health exams are largely normal, she does not show in her relation to them evidence of, you know, she doesn't show evidence of mutual thinking in talking to them. So of course, she experiences that, but she actually relates very, very well to the providers, and you know, totally in this case, no doctor provided, no doctor who says she has limitations beyond simple work. The only evidence here is her subjective reports of that, and as I go to point out in our brief, there are a number of pieces from this, and from other circuits, where claimants who have, these sort of mental impairments, where they have hallucinations or that she, her essential problem is that she, her mental illness, and that's really indicative of why she's violent, and the Social Security Administration does have an operations manual that talks about the mental health and some of the unsealed work, and when you review that, the categories, there are very many of them, but did the ALJ have to take those into consideration in making this determination? Please, go ahead. Well, I think the ALJ did take those into consideration in designing this decision, as we've been talking about, that it is explicit, but the, certainly, the doctors, the same as the doctors who evaluated her, did those demands into consideration. The ALJ then relied upon analysis. I don't recall seeing that in the market, when the ALJ analysis decision relied on the state examiners, but I don't recall seeing that in this module. Sophie, you had a question about the birchicula, the demands of unsealed work, based on the manual? As I stated earlier, when a medical opinion consensusarchy, the RT regulation requirement is lifted, and so that sort of analysis of bringing each week down, I don't think that'd be required in any situation. Right around here, isn't it? I think it's right here. It's right around here. I also, I only have a couple minutes left, since I wanted to also address the issue of the application of the GRIDs. You know, it's our position that the ALG is justified in applying for GRIDs. Sophie, did they fully account for her mental illness? Did they fully account for the limitations of the ALG reasonably enough in the RFCS? So, the GRIDs incorporate, the GRIDs aggregate all the unskilled jobs at an institutional level. And so, for a claim with a light, unskilled RFC, like Ms. Hossler, there would be 1,600 different jobs, even at some very light level, that the GRIDs indicate that she could perform. You know, Ms. Circular relied really heavily on a single sentence in the Holyhead case to claim the application, but the GRIDs never approved the claimant with mental impairments. So, that is number one, contrary to the agency's SSR 8515, which says that unskilled job needs provide substantial alleviation opportunities for persons with solely mental impairments. And it also runs contrary to another, a member of the Student Joint Support, and that including was telling the complaint case, which we raised tonight, the 28-day letter a few days ago, that he used to call about the physical and mental impairment, but the court explicitly said that even assuming that there was only a mental impairment, that the application of GRIDs is not necessarily an issue yet. And then we have subsequent decisions applied in Hyde, where the court says, where this court repeatedly applies the GRIDs to cases with limitations on its own court, and also importantly, in the context of this case, things like limitations on social functioning, which are some evidence, you know, some of the biggest evidence from one of the many records that she has on social functioning limitations. So, we submit that Hyde is considered controlling, and the court should reject the plaintiff's argument. I think some, while this judge's mental impairments may have been worse than the judge's, they were not deceivable for at least 12 consecutive months. So, your position is that the approach is okay, because of the record in this case? It was okay because, correct me if I'm wrong, it's a two-step process. And I think, you know, the appellate judge found that plaintiff gets backwards by looking at the GRIDs first, and at the IRS first. If the court finds that the RFC finding was supported by substantial evidence, and the only argument that plaintiff has made is related to the function-by-function assessment, which is the best decision, I believe, that's now required when in service with DSAW, but if the RFC finding is legally valid and supported by substantial evidence, then the question becomes, is that RFC finding, are the limitations on RFC finding, are they consistent with the restrictions on the GRIDs? And because this is an RFC for unskilled work, and the GRIDs explicitly only include unskilled work in the jobs that they aggregate, then the GRIDs would be appropriate in this case. So, respectfully, I'm not quite sure who wants to go to court. I'm not sure what my position would be. I'm not sure what my position would be.   I'm not sure what my position would be. Excuse me, so let's start at the outset. What are you asking for? What do you feel you're asking for? We're asking for a general hearing in the honor, and then to a decision in which the agency can then dictate, or do what it's intended for someone to do, and then exert some sort of interest in it. Okay. Sorry. I'm going to be engaging in the function-by-function analysis. This is what was indicated in picture 29, as he, just to put it, as he had announced residual functional capacity, that the analysis that was to follow was to be important in depth into the explication of the function-by-function analysis, and we're keen to mention the impairments so that that would inform the residual functional capacity. We do see, as Ava mentioned earlier, particularly on JL, the opinions, or assessment of the opinions only to the extent that they were consistent with the RFC, and you're doing that. And we had another social security case. Sorry? We had another social security case this week where the same language was used for, I guess it was... To the extent it was consistent. Right. Where is that language derived from? Is that in a case, or is that... I'm not sure, but I know that there are some cases that find that use of that language indicates that it's a core component. Right. It's a problematic kind of phrasing, unless it's supported by some case or something that says, that's what you do because it's almost circular. It's almost circular reasoning. Oh, yes. I would agree. Yes. I certainly do agree that it's circular reasoning. And as one of the reasons why I'm making that point now, as noted, Dr. McCoy, she was granted the opportunity to answer some of the questions that were asked. And I'm going to go back to your question. Did the agency correctly assess Ms. Ressler's care of her son in one place or the same while in another? I mean, there's sort of the same attribute in one area and in another. The LGA is saying, moderate with respect to the very same area, which is in this area meaning concentration and persistence in eggs. Moderate difficulty. So, that's excerpt 28. And later, it says, moderate. And Dr. McCoy, she was not evaluated for to review this decision adequately, would be a different question than Ms. Ressler would be as to you. Well, that's a different point. You know, the policy council made the point that she didn't demonstrate disability during this two-year period for a 12-month time during this two-year period. What is your response to that? I think the evidence shows that the medical documentation shows that there is adequate support to demonstrate disability on the part of Ms. Ressler with respect to the way in which she's afflicted by the voices of two years. The inability to stay on task, you know, that was the basis. I would submit the reason why her representative at hearing was asked for more task time, 10%, 15%. But we didn't see that assessed in the decision. And I think that's enough. That is what the court took into account. All right. Thank you. Thank you, sir. Anything else you'd like to add, Mr. Chairman? No questions here, Mr. Chairman. All right. Thank you very much, counsel. Ms. Ressler v. Barry Hill. I'm looking at these together. I'm considering a jurisdiction v. Strange Land Cash and Submitted. I'm looking at the math systems v. Strange Land Exchange.
judges: Wardlaw, Gould, Shea